UNITED STATES of America, Plaintiff-Appellee,

v.

$2,500 IN UNITED STATES CURRENCY, Defendant in Rem-Appellant.

No. 918, Docket 81–6180.

United States Court of Appeals, Second Circuit.

Argued April 5, 1982.
Decided Sept. 8, 1982.

---

J. D. Pope, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S.D. N.Y., Richard N. Papper, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

John L. Pottenger, Jr., New Haven, Conn. (Renee D. Chotiner, Stephen Wizner, P. J. Pittman, Jerome M. Frank, Legal Services Organization, Deborah M. Reyher, Yale Law School 1983, Law Student Intern, New Haven, Conn., on the brief), for defendant in rem-appellant.

Before KEARSE and PIERCE, Circuit Judges, and LEVAL,* District Judge.

LEVAL, District Judge:

Claimant-Appellant Jimmy Aponte appeals from a judgment of forfeiture of $2,500 in United States currency, entered by Hon. John M. Cannella upon a jury verdict. Judge Cannella denied Aponte's motion for judgment notwithstanding the verdict or, alternatively, a new trial. Aponte appeals on a number of grounds, including the ground that the allocation of the burden of proof in the forfeiture proceedings violated due process. We affirm.

## FACTS

The forfeited currency was seized in the course of the arrest of Aponte and his wife on heroin charges and the search of their apartment on December 6, 1979. Aponte

* Honorable Pierre N. Leval, of the United States District Court for the Southern District of New York, sitting by designation.

eventually pleaded guilty to the charge of selling two ounces of heroin for approximately $16,000 to an undercover agent of the Drug Enforcement Administration on October 11, 1979. The sale had taken place at the Apontes' apartment. During the course of the transaction, Aponte had expressed a willingness to sell larger quantities of heroin whenever the undercover agent was ready to buy.

The seized money was found in a small travel case in a closet in the Apontes' apartment. The case also contained a number of unpaid bills and a notepad full of names and numbers. A government agent testified at the trial to the effect that these notations recorded Aponte's drug transactions. The search also turned up sixty grams of cocaine and a scale accurate to a tenth of a gram.

During the search of his apartment, Aponte stated that the seized money belonged to a friend whom he refused to identify. At trial, Aponte's wife and mother testified that the money represented wages earned by Aponte at a restaurant and as a gypsy cab driver and also included cash that Aponte's mother had given him for safekeeping. The police officer who surveilled Aponte during the weeks before his arrest testified that he saw no sign that Aponte was a taxi driver. Aponte did not testify at the trial.

## DISCUSSION

■ Subsection 881(a)(6) of title 21 provides for the forfeiture of "moneys . . . furnished or intended to be furnished . . . in exchange for [an illicit] controlled substance." 21 U.S.C. § 881(a)(6) (Supp. IV 1978). Section 881(d) directs that the proceedings to forfeit such property shall be conducted in accordance with the "law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws." 21 U.S.C. § 881(d) (1976 & Supp. III 1979). The applicable customs statute states that "the burden of proof shall lie upon [the] . . . claimant . . . *Provided,* That probable cause shall be first shown for the institution of

such suit or action, to be judged of by the court." 19 U.S.C. § 1615 (1976). Aponte contends that this allocation of the burden of proof violates due process because forfeiture under 21 U.S.C. § 881(a)(6) constitutes criminal punishment. *See generally In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (requiring proof of guilt beyond a reasonable doubt in criminal proceedings). This argument has been rejected by the Tenth Circuit, *Bramble v. Richardson,* 498 F.2d 968 (10th Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974). We reject it as well.

It is clear that Congress may impose both a criminal and civil sanction for the same conduct. *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917, 922 (1938). The question whether subsection 881(a)(6) imposes a criminal or civil sanction is primarily a matter of statutory construction. *Id.*

> Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other . . . Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention . . . . In regard to this latter inquiry, we have noted that "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground."

*United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742, 749 (1980) (citations omitted). As to whether the remedy is too "punitive" to tolerate civil litigation procedures, the Court has suggested a number of factors to be considered:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of

punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963) (footnotes omitted).

As to the first level of inquiry, Congress indicated both "expressly [and] impliedly a preference for" the civil label. The Comprehensive Drug Abuse Prevention and Control Act of 1970[1], 21 U.S.C. §§ 801–966 (1976) (hereinafter "the Act"), makes a clear distinction between criminal "Offenses and Penalties," which are set forth in Part D of the Act, 21 U.S.C. §§ 841–852, and "Administrative and Enforcement Provisions," including forfeiture, which are set forth in Part E, 21 U.S.C. §§ 871–886. As to the latter, the Act expressly adopts the civil procedures of the Customs Laws for *in rem* proceedings. *See generally* 19 U.S.C. §§ 1602–1615 (1976).

Turning to the first aspect of the second level of inquiry, we do not find "the clearest proof" that the forfeiture involved here is so punitive in purpose as to override Congress' intention to enact a civil penalty. The Act itself is replete with legislative findings and unquestionably civil provisions designed to serve its broad remedial purposes. Some of these are reviewed in the margin.[2] Forfeiture of drugs, vehicles and money used in drug trafficking has many apparent remedial, non-punitive purposes. These include impeding the success of the criminal enterprise by eliminating its resources and instrumentalities, diminishing the efficiency and profitability of the business by increasing the costs and risks associated with it, and helping to finance the government's efforts to combat drug trafficking. The provisions at issue here serve these purposes. Section 511(a) provides for forfeiture of controlled substances, plants, raw materials used to fabricate them, articles used as containers, vessels and vehicles used for transportation, and books and rec-

1. 70 Pub. L. No. 91–513, § 511, 84 Stat. 1236, 1276 (1970). Subsection 881(a)(6) was enacted as an amendment to the act in 1978. Psychotropic Substances Act, § 301, Pub. L. No. 95–633, 92 Stat. 3768, 3777 (1978).

2. Section 101 of Title II of the Act sets forth legislative findings and declarations including "the detrimental effect on the health and general welfare of the American people" resulting from "illegal importation, manufacture, distribution, and possession and improper use of controlled substances," § 101(2), 21 U.S.C. § 801(2) (1976), the flow of "a major portion of the traffic in controlled substances" through "interstate and foreign commerce," § 101(3), *id.* § 801(3), and the United States' membership in international treaties and conventions "designed to establish effective control over international and domestic traffic in controlled substances." § 101(7), *id.* § 801(7). Section 309(a) establishes requirements for medical prescriptions dispensing controlled substances.

Title I of the Act provides, in part, for the dissemination of educational materials and the development of educational programs for the prevention of drug abuse. The National Institute of Mental Health is established as a focal point for the collection and dissemination of information and the preparation of a national program for drug abuse education. Sec. 1(a), 84 Stat. 1238 (1970). Grant programs are authorized for treatment of addicted persons.

Provision is made to protect the right of privacy of persons studied under programs for research on the effect of drugs. Sec. 3(a); 42 U.S.C. § 242a(a) (1976).

Part E of the Act provides for Administrative and Enforcement Provisions and contains the forfeiture provisions here in controversy (as amended by Pub. L. No. 95–633, § 301(a), 92 Stat. 3777 (1978)) 84 Stat. 1270–1280 (1970). It authorizes the Attorney General to accept donations in the name of the Department of Justice "for the purpose of preventing or controlling the abuse of controlled substances," § 501(c), 21 U.S.C. § 871(c) (1976), and to carry out education and research programs on deterrent effects of various enforcement strategies, on detecting the presence of drugs and field identification, and on effective methods to identify sources and prevent diversion of drugs to illegal channels. § 502(a), *id.* § 872(a). The Attorney General is directed to cooperate with other governmental agencies toward exchange of information, prosecution of cases before licensing boards as well as criminal courts, conduct of training programs, cataloguing information and destruction of drug producing plants § 503(a), *id.* § 873(a). He is authorized to appoint advisory committees, § 504, *id.* § 874, hold administrative hearings, § 505, *id.* § 875, issue administrative subpoenas, § 505, *id.,* and conduct inspections, § 510, *id.* § 880.

ords. 21 U.S.C. § 881(a) (1976). The provision was clearly aimed at the instrumentalities of the drug trade with the clear intent of preventing their continued use. In 1978, Congress added the particular subparagraph, 21 U.S.C. 881(a)(6) (Supp. IV 1978), covering moneys and securities utilized in drug traffic, under which this forfeiture was effected. Pub. L. No. 95–633, § 301(a), 92 Stat. 3777 (1978). The addition of moneys to the list of plants, raw materials, vehicles, and records used in drug traffic apparently reflects an indisputable legislative finding that money in the narcotics trade finances and assists future trade at least as much as vehicles and containers and a decision that they should likewise be seized in the effort to impede such traffic. The authorization to the Attorney General to retain forfeited property for official use or sell it and use the proceeds, 21 U.S.C. § 881(e), serves the remedial purpose of equipping and financing law enforcement activities.[3]

Similarly, we do not find "the clearest proof" that the forfeiture involved here is so punitive in effect as to override congressional intent. The statute makes no attempt to tailor the amount of the loss suffered by forfeiture to the degree of culpability, a strong indication that any punitive effect is incidental. The seizure of money is excessive neither in the abstract nor on the facts of this case.

Historically, forfeitures have always been regarded as civil. *See United States v. Regan,* 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (tracing the civil nature of forfeitures back to the earliest days of this country). This historic civil designation accurately reflects society's view that criminal judgments are of a fundamentally different character. Applicants for employment are often asked if they have been convicted of crimes; rarely, if ever, are they required to disclose judgments of forfeiture. The same distinction is observed on innumerable other questionnaires and applications that people

fill out in the course of everyday life. Similarly, while the term "convicted felon" is a commonplace in our vernacular, no such pejorative term has arisen to describe the victims of forfeiture judgments.

A number of cases decided by the Supreme Court over the years lend limited, but insufficient, support to appellant's position. The strongest support comes from Justice Bradley's opinion in 1886 in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). That case held unconstitutional as compulsory self-incrimination a statute that required a claimant in a forfeiture proceeding to produce his books and records or suffer an adverse finding based on his failure to do so. Justice Bradley remarked that forfeiture "though technically a civil proceeding, is in substance and effect a criminal one" and that forfeitures incurred by the commission of offenses were of "quasicriminal nature" and "within the reason of criminal proceedings for all the purposes of" the fourth amendment and the self-incrimination clause of the fifth amendment. *Id.* at 634, 6 S.Ct. at 534, 29 L.Ed. at 752. This language suggests that, had petitioner had the opportunity to present his contention to Justice Bradley in 1886, he might at least have received a sympathetic hearing.

In the same term, in *Coffey v. United States,* 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886), the Supreme Court touched on the issue of the standard of proof in a forfeiture proceeding. The Court there set aside a judgment of forfeiture on the ground that it was precluded by the earlier acquittal of the owner on the charges predicate to the forfeiture. In response to the government's argument that the acquittal should not preclude the forfeiture "because of the rule requiring guilt to be proved beyond a reasonable doubt, and that, on the same evidence, on the question of preponderance of proof, there might be a verdict for the United States," *id.* at 443, 6 S.Ct. at 440, 29 L.Ed. at 687, the Court answered

---

**3.** It is our understanding that automobiles are indispensable to the undercover work of narcotics agents and that the automobiles used by

the government for such work are supplied in large part out of seizures under those provisions.

not that the burdens should be the same, but that the difference in burdens was irrelevant as the facts had been put in issue and decided. *Id.*

A similar issue was raised before the Supreme Court in *Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), in which it was contended that a prior acquittal on a tax fraud prosecution established defenses of *res judicata* and double jeopardy barring enforcement of a 50% penalty. As to the claim of *res judicata,* Justice Brandeis rejected it precisely by reason of the lesser burden of proof necessary to enforce the penalty, *id.* at 397, 58 S.Ct. at 632, 82 L.Ed. at 920–21, rejecting the holding of *Coffey.* As to the second argument, the Court held that double jeopardy would not be applicable unless the penalty "was intended as punishment, so that the proceeding is essentially criminal." *Id.* at 398, 58 S.Ct. at 633, 82 L.Ed. at 921. Justice Brandeis noted the broad power of Congress to classify sanctions as criminal or civil where they have a remedial purpose. "Forfeiture of goods . . . and the payment of . . . sums are other sanctions which have been recognized as enforceable by civil proceedings since the original revenue law of 1789." *Id.* at 400, 58 S.Ct. at 633, 82 L.Ed. at 922. The opinion enumerates with voluminous citations the various aspects of civil procedure properly applied in such forfeiture and penalty proceedings, including that "there is no burden upon the government to prove its case beyond a reasonable doubt." *Id.* at 403, 58 S.Ct. at 635, 82 L.Ed. at 924. It goes on to give great deference to Congress' classification of the penalty as civil. The opinion also notes the remedial purposes of the sanctions "as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and other loss resulting from the taxpayer's fraud." 303 U.S. at 401, 58 S.Ct. at 634, 82 L.Ed. at 923.

Some limited support for appellant's argument also comes from Justice Goldberg's opinion in *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). The question at issue was the applicability of the exclusionary rule to a proceeding to forfeit a car used in the commission of a violation of the Pennsylvania liquor laws. The opinion pointed out that the criminal offenses carried lighter sanctions than the forfeiture of the automobile and reasoned from this fact that:

> [i]t would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding . . . the same evidence would be admissible.

*Id.* at 701, 85 S.Ct. at 1251, 14 L.Ed.2d at 175. Relying on the authority of Justice Bradley's opinion in *Boyd,* the Court concluded that the fourth amendment and the exclusionary rule applied to forfeiture proceedings predicated on criminal violations. The opinion did not consider whether the same reasoning would apply where, as here, the criminal penalties far exceed the severity of the forfeiture.

*United States v. United States Coin and Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), is of little value to plaintiff. All it holds is that a forfeiture predicated on the commission of a criminal offense will not lie when such criminal offense has been ruled an unconstitutional violation of the privilege against self-incrimination. In particular, gamblers cannot be subjected to convictions or forfeitures for having violated a statute requiring them to register and pay a tax if the statute is void as an unconstitutional imposition on their rights against self-incrimination. The opinion is comforting to appellant not for its holding but because it repeats the above quoted language of Justice Bradley from *Boyd.*

Although the cases cited by appellant do indeed note functional similarities between criminal and forfeiture proceedings, especially those predicated on findings of criminal violations, and do impose on forfeiture proceedings certain procedural protections rooted in the fourth and fifth amendments, they do not obliterate the differences between forfeitures and criminal sanctions, do not make all incidents of criminal procedure

applicable to forfeiture proceedings, and do not impose the beyond reasonable doubt standard in forfeiture proceedings. *United States v. Regan,* 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914), emphatically so held with the observation that these questions had "been so often considered by [the Supreme Court] that our present duty ... is chiefly that of applying settled rules of decision." *Id.* at 41, 34 S.Ct. at 214, 58 L.Ed. at 496. *Cf. Hepner v. United States,* 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909) (directed verdict permissible in action to enforce a penalty).

■ Appellant's remaining grounds for appeal do not require extended discussion. First, Aponte contends that the trial court's instruction as to Aponte's right to appear at the trial and testify violated Aponte's right against self-incrimination. This instruction was precipitated by Aponte's counsel's examination of Aponte's wife in a manner that could have given the jury the misimpression that Aponte's confinement prevented his testifying in his own behalf.[4] It simply informed the jury that Aponte could have testified if he had wanted to do so.[5] Aponte also contends that the district court's decision to quash a subpoena directed at his probation officer violated due process. Aponte's argument is based on his contention that the proceedings were essentially criminal, Appellant's Brief at 67, an argument that we have already rejected. Moreover, Judge Cannella determined upon *in camera* inspection that the vast majority of the subpoenaed materials were inadmissible hearsay in that they contained self-serving statements by Aponte himself. Ab-

sent some showing of special need by Aponte, we see no reason to breach the confidentiality of the Probation Department's post-sentencing supervisory reports.

■ Finally, we see no merit in Aponte's contention that the trial court erred in finding that the United States had met its burden of showing probable cause to believe that the seized money was furnished in exchange for drugs. This quantity of cash is substantially greater than is commonly kept in residential premises by law-abiding wage earners. Surveillance of Aponte over a period of time had revealed no other apparent explanation for the cash. Agents of the Drug Enforcement Administration had recently paid Aponte $16,000 for the purchase of heroin, in the course of which transaction he offered to sell more. Aponte had admitted that sale by his plea of guilty to the criminal charges. The money was found secreted in a case in a closet together with a notepad recording drug transactions. Sixty grams of cocaine and a fine precision scale of the type used in drug dealings were found in the apartment at the same time. This evidence was more than sufficient to establish probable cause. *See United States v. $364,960.00 In United States Currency,* 661 F.2d 319, 324–25 (5th Cir. 1981) (circumstantial evidence may be sufficient to show probable cause even when no actual transaction has been witnessed).

The judgment of the district court is affirmed.

---

4. "Q. Where is Jimmy today?
   A. In jail.
   Q. And do you know where the jail is?
   A. In Connecticut. In Danbury.
   Q. Is that a federal prison?
   A. Yes."
Joint Appendix at 188–89.

5. Judge Canella instructed the jury as follows:
   ... in a forfeiture case, the law does not compel a claimant to testify. Therefore, no presumption may be raised and no inference of any kind may be drawn from the fact that the claimant has not testified.

   However, you will recall that one of the claimant's witnesses testified that the man is presently in Danbury and in prison. I must advise you that the claimant has a right to have his lawyer request of the Court a writ which has a fanc[y] Latin name but simply means a writ to come to court and testify, a writ ad testificandum, and that if the lawyer had made such a request of the Court, the Court would have issued the writ and the claimant would have been produced in court. He had the right to be here if he wanted to be here and he could have exercised that right. He chose not to.
Joint Appendix at 227.